# Supreme Court of Texas

No. 24-0036

Anne Carl and Anderson White, as Co-Trustees of the
Carl/White Trust, on Behalf of Itself and a
Class of Similarly Situated Persons,

*Appellants*,

v.

Hilcorp Energy Company,

*Appellee*

On Certified Questions from the United States
Court of Appeals for the Fifth Circuit

**Argued March 19, 2024**

JUSTICE BLACKLOCK delivered the opinion of the Court.

Minerals that have already been processed or transported are generally more valuable than the same minerals taken straight from the ground. This difference in value can create confusion and controversy between mineral producers and royalty holders. Many leases give the royalty holder an interest in the minerals "at the well" or "at the wellhead," or they use other equivalent language indicating that the royalty interest is in the minerals as they come out of the ground, not

after processing, transportation, or other "post-production" efforts have increased the minerals' value. Often, however, minerals are not sold until after post-production efforts have increased their value, which means the sale price available for a royalty calculation is on a more valuable product than the "at-the-well" minerals in which the royalty holder has an interest. In such a case, simply paying the royalty holder his percentage of the sales price would result in a windfall, because he owns a percentage of the minerals' lower value "at the well," not a percentage of the minerals' greater value after the expenditure of post-production costs.

To account for this disparity—between the value of the product when it is sold and the value of the product "at the well"—an "at-the-well" royalty holder's proportionate share of the post-production costs expended to increase the value of the production must be accounted for prior to payment of the royalty. As we recently observed, "[b]ecause postproduction costs are not incurred until after gas leaves the wellhead, and because postproduction costs add value to the gas, backing out the necessary and reasonable costs between the sales point and the wellhead is accepted as an adequate approximation of market value at the well." *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 389 (Tex. 2021). We have called this way of accounting for post-production costs "the workback method." *Id.* at 388–89. "When the location for measuring market value is 'at the well' (or equivalent phrasing), the workback method permits an estimation of wellhead market value by using the proceeds of a downstream sale and subtracting postproduction costs incurred between the well and the point of sale." *Id.*

The royalty holder in this case was unsatisfied with the reduced royalty payment resulting from the producer's accounting for post-production costs. But the parties do not dispute that their lease conveys an "at-the-well" royalty. And it has long been the law that the holder of an "at-the-well" royalty must share proportionately in the post-production costs expended on the products of the well prior to sale. *See, e.g.*, *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019); *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 873 (Tex. 2016); *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 3 (Tex. 2014); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996). We recently summed up the longstanding rule as follows: "When a mineral lease requires royalty to be computed 'at the well,' the royalty interest bears its usual share of postproduction costs" unless the lease provides otherwise. *Randle*, 620 S.W.3d at 389.

This dispute appears to have arisen from the way the producer accounted for post-production costs, a method with which we find no fault. The producer used some of the gas produced from the well to power post-production activities conducted off the lease on other gas produced from the well. The value of the gas used for post-production activities was a post-production cost of the kind normally chargeable to the royalty holder. The producer accounted for this value by subtracting the volume of gas it used in post-production from the total volume of gas on which it calculated the royalty. The royalty holder sued, arguing that the producer could not subtract the volume of gas used in post-production because the lease required payment of a royalty on *all* gas produced from the well.

3

The royalty holders, Anne Carl and related parties, rely primarily on two lease provisions. The first obligates the producer, Hilcorp, to pay a royalty "on gas . . . produced from said land and sold or used off the premises." Carl does not dispute that this royalty on gas "sold or used off the premises" must be calculated based on "the *market value at the well* of one-eighth of the gas so sold or used." (Emphasis added.) Hilcorp argues that, because this is an "at-the-well" royalty, it may subtract out the value of the gas it uses in post-production activities before paying Carl's royalty. Carl objects that if the gas used in post-production is removed from the royalty calculation, then she is not being paid for *all* the gas "sold *or used* off the premises" (Emphasis added.) We agree with Hilcorp.

Carl's royalty on all gas "sold or used off the premises" does not alter her obligation to bear the "usual share of postproduction costs" as the holder of an "at-the-well" royalty. *See Randle*, 620 S.W.3d at 384, 389. Just as with other post-production costs that add to the value of the minerals sold, the gas Hilcorp uses "off the premises" for post-production activities must be accounted for when calculating Carl's "at-the-well" royalty. Carl is correct that she has a royalty interest in *all* the gas produced, including the gas used off the premises. But in order to calculate the *at-the-well* value of *all* the gas produced, Hilcorp was entitled to account for reasonable post-production costs, which include the value of the gas used off the premises to prepare other royalty-bearing gas for sale.[1] Hilcorp's accounting may have given Carl

---

[1] If some of the gas produced from the well were "used off the premises" for something other than post-production activities on other gas produced from

4

the impression that she was not being paid for all the gas produced, but Carl was not shortchanged. Hilcorp's calculation was one permissible way to convert its downstream sales price into an at-the-well market value on which to pay the royalty, as required by this lease.

Carl also relies on the following lease language: "Lessee shall have free use of oil, gas, coal, wood, and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas, and coal shall be computed after deducting any so used." This provision gives Hilcorp "free use" of gas "for all operations hereunder." Carl reasons that Hilcorp does *not* have "free use" of gas for operations conducted off the lease, which she argues are not included in "operations hereunder." As a result, Carl says, Hilcorp does not have "free use" of the gas it uses in post-production activities off the lease, so it must pay royalty on that gas rather than subtracting it from the calculation in its post-production-cost accounting.

Once again, Carl invokes a provision of the lease that has no impact on her obligation, as the holder of an "at-the-well" royalty, to bear the "usual share of postproduction costs." *Randle*, 620 S.W.3d at 389. The relevant question is not whether the lease entitles Hilcorp to "free use" of the gas it uses in post-production activities. If the lease did so, this might be an additional reason Hilcorp prevails. But we can assume Carl is right that the lease does not do so. The fact remains that Carl, as the holder of an "at-the-well" royalty, must share in post-production

_____

the well, then a royalty would be due on the gas so used. We do not understand Carl to make such an allegation.

costs—whether or not those costs include using some of the gas produced from the well.

As the federal district court observed, Carl does not claim that the gas Hilcorp used in post-production was not a genuine post-production cost of the kind that would normally be shared by an "at-the-well" royalty holder. 2021 WL 5588036, at *1, *5 (S.D. Tex. Nov. 30, 2021); 2022 WL 20699680, at *2 (S.D. Tex. Apr. 6, 2022). Instead, Carl's argument is that other clauses in the lease—coupled with our decision in *Randle*—somehow override her usual obligation to bear her share of post-production costs under her "at-the-well" royalty. The parties certainly could have contracted for the outcome Carl seeks by allocating post-production costs differently, but none of the provisions Carl cites have any effect on the extent to which this royalty bears post-production costs. By creating an "at-the-well" royalty, the parties indicated that the royalty would bear those costs. None of the lease language Carl relies on alters that arrangement.

Nor does our decision in *BlueStone v. Randle* have any particular impact on the outcome, except that it reiterates the longstanding rule that an "at-the-well" royalty "bears its usual share of postproduction costs." 620 S.W.3d at 389. *Randle* construed a "free-use" clause resembling the one at issue here. But *Randle* neither said nor suggested that "free-use" clauses change an "at-the-well" royalty holder's obligation to bear its share of post-production costs. *Randle* involved a "gross-proceeds" royalty, which generally does not bear post-production costs—so the question of how to account for post-production costs was not before the Court at all in *Randle*. If the dispute between Carl and

6

Hilcorp were genuinely about what their "free-use" clause means, then *Randle* might be of some assistance. But as explained above, the "free-use" clause in this lease has no bearing on the outcome of the dispute over how to account for post-production costs.

The federal district court correctly concluded that Carl's reliance on *Randle*, on the "free-use" clause, and on the "off-lease-use-of-gas" clause, amounted to a distraction from the real issue between these parties, which is post-production costs. On that issue, this lease leaves no doubt. 2021 WL 5588036, at *3–4. Carl is entitled to a royalty on the "market value at the well" of the gas sold or used, which means her royalty bears its usual share of post-production costs, including the cost of gas produced from the well and used off the lease to power post-production activities on other gas from the well. *See also Fitzgerald v. Apache Corp.*, No. H-21-1306, 2021 WL 5999262, at *4–8 (S.D. Tex. Dec. 20, 2021) (correctly rejecting substantially the same arguments rejected by the district court in this case).

The first certified question reads as follows:

1. After *Randle*, can a market-value-at-the well lease containing an off-lease-use-of-gas clause and free-on-lease-use clause be interpreted to allow for the deduction of gas used off lease in the post-production process?

For the foregoing reasons, we answer Yes.[2]

---

[2] Attaching labels to general categories of lease clauses—e.g., "off-lease-use-of-gas" clause and "free-on-lease-use" clause—can give the misimpression that all clauses to which those labels apply will operate in the same way. To the contrary, all leases—and all clauses within them—should be interpreted first and foremost based on what they say, not based on the

The Fifth Circuit also asks:

2. If such gas can be deducted, does the deduction influence the value per unit of gas, the units of gas on which royalties must be paid, or both?

The briefing in this Court does not address the second question. The parties appear to agree that the question is primarily one of accounting and that it does not impact their legal rights or ultimate financial prospects. Our rough mathematical calculations indicate that, in a situation like this one, either of the two accounting methods described in the second question would yield the same royalty payment. The parties' lack of interest in the second question seems to confirm our calculations. Without assistance from the parties, we decline to offer further thoughts on the second question, other than to emphasize that nothing in this opinion should be understood to state a preference for any particular method of royalty accounting, so long as the accounting results in the royalty holder being paid what he is lawfully owed.

James D. Blacklock
Justice

**OPINION DELIVERED:** May 17, 2024

---

labels we may use to describe their various parts. Two leases, both of which contain a clause accurately labelled a "free-on-lease-use" clause, could very well produce opposite results under the same facts, depending on their precise wording and other relevant language in the lease.